**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JEFF FARMER | * |
| Plaintiff | * |
| v | *  Civil Action No.  PWG-17-346 |
| WEXFORD HEALTH SOURCES, INC.,[1] | * |
| DR. MOFIKPARA WRIGHT, | |
| DR. MULETA OBSU, | * |
| DR. BOLAJI ONABAJO, | |
| DR. JONATHAN THOMPSON, and | * |
| REBECCA BARNHARDT, RN | |
| | * |
| Defendants | |

\*\*\*

## <u>MEMORANDUM OPINION</u>

Defendants Wexford Health Sources, Inc., Mofikpara Wright, M.D., Muleta Obsu, M.D., Bolaji Onabajo, M.D., Jonathan Thompson, M.D., and Rebecca Barnhart, R.N., move to dismiss or in the alternative for summary judgment in response to this civil rights complaint.  ECF No. 21.  Plaintiff Jeff Farmer opposes the motion.  ECF No. 33.  Defendants filed a Reply.  ECF No. 36.  Also pending are Defendants' Motion for Protective Order (ECF No. 37) and Plaintiff's Motions for Temporary Injunction (ECF No. 38) and for an Extension of Time to file a Class Action (ECF No. 41).  No hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons that follow Defendants' motion, construed as a Motion for Summary Judgment, is granted in part and denied in part.  Defendants' Motion for Protective Order shall be denied in part and Plaintiff's Motions for Injunctive relief and to file a class action shall be denied. Defendants shall file their answers on or before January 5, 2018.

---

[1]        The Clerk SHALL CORRECT the full spelling of Defendants' names on the docket.

**Background**

Plaintiff Jeff Farmer is an inmate committed to the custody of the Maryland Department of Public Safety and Correctional Services and currently confined at Eastern Correctional Institution (ECI).[2] Farmer alleges he has been denied back surgery and effective pain management pending the surgery; his prescription for pain medication was reduced to one-third of his previous dosage for non-medical reasons; his allergy medication was changed to something less effective; and he has not received treatment for a shoulder injury sustained during a fall from a prison van. Compl. 3, ECF No. 1. Farmer claims that he has moderate and severe disc herniation, spinal stenosis and broken pieces of bone in his lower back (lumbar spine at levels L4, L5, and S1). *Id.* at 4. He states that prior to his current incarceration he was scheduled for surgery and claims he is entitled to receive that surgery (known as kyphoplasty) while he is incarcerated. Farmer explains he is experiencing such severe pain that he has difficulties sleeping and continued denial of the surgery violates his rights under the Eighth Amendment. *Id.* The specific claims he raises regarding his care are set forth below.

*Pain Medication*

Farmer claims that his Neurontin dosage was reduced to one-third of his previous dosage for no justifiable medical reason; rather, it was done by Dr. Obsu in retaliation for administrative remedy procedure complaints ("ARPs") Farmer filed regarding medical care. Compl. 3. Farmer alleges that recent blood tests did not show a valid reason for the cut in pain medication. *Id.*

Defendants do not deny decreasing the dosage of Farmer's Neurontin and explain that the dosage initially prescribed to Farmer was too high. Wright Aff. ¶¶ 5–7, ECF No. 21-5. Dr. Wright describes the purpose and effects of Neurontin (a.k.a., Gabapentin), a gabapentinoid. *Id.*

---

[2] During the pendency of this action Farmer has also been incarcerated at Dorsey Run Correctional Facility (DRCF) and Maryland Correctional Training Center (MCTC).

He states that medications like Neurontin "are widely used in neurology, psychiatry, and primary healthcare" for the treatment of "neuropathic pain, fibromyalgia and postherpetic neuralgia." *Id*. It is "thought to possess GABA-mimetic properties which have direct and indirect effects on the brain's dopamine 'reward' system." *Id*. "Neurontin has been regularly prescribed with positive result in the treatment of patients with chronic pain and in the management of patients for opioid withdrawal." *Id*.

Dr. Wright also provides information regarding the dosage for Neurontin and states that the "FDA recommended maximum adult dosage is 2400-3600 mg per day." *Id*. at ¶ 7. When dosages exceed the recommended dosage, Neurontin is "reported to cause sedative as well as dissociative/psychedelic effects." *Id*. Additionally, at higher than therapeutic dosages, drugs like Neurontin have a higher rate of addictiveness. *Id*. Further, in patients "with a history of polypharmacy and drug abuse" there is "an increased risk of addiction to [Neurontin's] dopamine 'reward' effect resulting in a need for increasing the medications recommended dosage level beyond the therapeutic dose over time to receive the same effect." *Id*. Conversely, at therapeutic levels, Neurontin has a low rate of addiction making it a good option for pain management in the prison environment. *Id*. ¶ 8. An increased dose of Neurontin does not provide additional clinical benefits as the rate of absorption drops with higher dosages (*e.g.*, "a 900 mg dose will be absorbed [at a rate of] 60%, a 2400 mg dose provides a 34% absorption [rate]."). *Id*. Side effects such as "dizziness, somnolence,[3] headache,[4] diarrhea, confusion, nausea, and peripheral edema" increase at higher dosages.

---

[3]   Somnolence is "the quality or state of being drowsy." *See* http://c.merriam-webster.com/medlineplus/.

[4]   The Court notes that among his noted chronic medical issues, Farmer suffers headaches.

Farmer was prescribed 800 mg of Neurontin, two tablets twice daily between April 13, 2016 through August 13, 2016. *Id.* ¶ 9. Farmer was also receiving: 800 mg of Ibuprofen as needed three times a day; Excedrin migraine; 50 mg of Ultram[5] two times a day; and 350 mg of Soma[6] one tablet twice per day. *Id.* On July 15, 2016, when Dr. Wright saw Farmer at Dorsey Run Correctional Facility ("DRCF"), he reviewed the medications Farmer was receiving and determined that the amount of Neurontin he was receiving was too high, given all the other medications he was taking. *Id.* ¶ 10. Dr. Wright changed the prescription to 800 mg of Neurontin, one tablet twice daily. *Id.* ¶ 11.

Dr. Wright explains that Neurontin is a "non-formulary medication" at DRCF, meaning it takes a period of time to process the request for the drug and at times the request is "disapproved." *Id.* With those factors in mind, Dr. Wright wrote orders "to discontinue [Farmer's] existing 800 mg Gabapentin, 2 tablets twice daily if the new order for 800 mg, 1 tablet twice daily was approved." *Id.* An error was made, however, and Farmer's prescription order was "transcribed as 'Gabapentin 800 mg take two by mouth three times per day, discontinue the old order for Neurontin, if this order is approved.'" *Id.* Based on that erroneous order, Farmer was given 4800 mg per day, a dose that Dr. Wright states was "supratherapeutic and not intended." *Id.*

Farmer continued to receive the incorrect dosage until October 24, 2016, when Dr. Obsu discontinued it and prescribed 800 mg, one tablet twice daily. *Id.* ¶ 14. Farmer's other prescriptions for Soma and Ultram were unchanged. *Id.* Prior to Dr. Obsu changing the prescription, Dr. Syed Rizvi noted the excessive dosage of Neurontin during an August 3, 2016

---

[5] Ultram (tramadol) is a narcotic-like pain reliever used to treat moderate to severe pain. *See* drugs.com.
[6] Soma (carisoprodol) is a muscle relaxer that blocks pain sensations between the nerves and the brain. *See* drugs.com.

chronic care clinic visit with Farmer. *Id.* ¶ 12. Dr. Rizvi indicated his intention to follow up with Dr. Wright regarding the prescription and continued it in the interim. *Id.* Although Farmer was seen on August 22, 2016, for his shoulder pain, his medications were not reviewed at that time. *Id.* ¶ 13. It is this change to the prescribed Neurontin upon which Farmer bases his claim against Dr. Obsu. *See* Compl.

Farmer complained about the change in dosage on April 6, 2017, when he was seen by Dr. Thompson at Maryland Correctional Training Center (MCTC) and informed the doctor he needed 800 mg of Neurontin three times a day. Farmer Med. R. 50, ECF No. 21-4. Dr. Thompson explained to Farmer that "institutional policy was to issue medications twice daily, and it would not be changed for [Farmer]." *Id.* Farmer's prescription for Neurontin provided for 2400 mg per day with two 600 mg tablets, twice a day. *Id.* Farmer's additional request for an increase in Tramadol was denied as it was not clinically indicated. *Id.*

*Allergy medication*

Farmer also claims that on October 25, 2016, Dr. Obsu changed his allergy medication "from Claritin back to Zyrtec (that I was on for many months and did not work either)." Compl. 4. Despite putting in sick call slips regarding the change in medication, Farmer states that he was not seen by a doctor until November 8, 2016. At that time, he was seen by Dr. Wright whom he claims "did absolutely nothing about my allergy medication." *Id.* Farmer claims Dr. Wright told him he would contact Dr. Obsu to determine if there was a reason for the change in medication; however, when Farmer asked about it, the nurses told him there was nothing noted in his record. *Id.* Farmer opines that this is "the definition of deliberate indifference to my ailments." *Id.* He claims he saw Dr. Obanajero on an unspecified date, and Farmer was told that

his allergy medication would be changed, but as of January 24, 2017, no change had occurred. *Id*. at 5.

Dr. Wright admits that Farmer was taking Zyrtec, but states that he had been prescribed that medication since April 13, 2016, and it was continued through August 3, 2016, when it was not renewed. Wright Aff. ¶ 16. The Zyrtec prescription was renewed on October 24, 2016, as Farmer "had not submitted any complaints that [it] was not effective." *Id*. However, Dr. Wright initially states that Farmer complained that Zyrtec was ineffective and that his prescription was changed to Aprodine on February 10, 2017, "in response to Plaintiff's complaints." *Id*. Wright concludes that it is his "opinion to a reasonable degree of medical probability" that the change to Aprodine "was an appropriate medication change for [Farmer's] allergic rhinitis." *Id*.

*Back Injury and Surgery*

Farmer states that the condition of his back requires surgery which should be performed during his incarceration so he will not have to miss work when he returns home. He claims that surgery was recommended prior to his incarceration. Compl. 3–4.

Defendants do not directly address Farmer's claim that he is entitled to back surgery, but provide verified medical records that make mention of two previous imaging results of Farmer's lumbar spine. Farmer Med. R. 1. As early as September 30, 2014, Dr. Ben Oteyza noted that Farmer had a history of back pain and that MRI reports regarding the condition of Farmer's back were conflicting. *Id*. Oteyza observed that "[p]ersonal opinion is that this patient is not suffering the magnitude of discomfort that he claims. May need a good, thorough orthopedic evaluation." *Id*. Despite that observation, Oteyza did not order a referral at that time, but instructed a "follow up if condition worsens or no improvement within 14 days." *Id*. at 2. When Oteyza saw Farmer

again on October 23, 2014, and Farmer asked for a referral, the referral was made. *Id*. at 3. That referral was "declined" following collegiate review. *Id*. at 10.

The first of the MRI reports referenced, dated September 1, 2008, indicated that Farmer had a "large left paramedian disk herniation at L5-S1 . . . [m]oderate central disk herniation at L-4-5." *Id*. (Nov. 16, 2015 Provider Visit). The second MRI report, dated November 14, 2013, is noted as showing

> [m]arked improvement in the large left paracentral disk herniation L5-S1 since the study of 9/1/2008. There remains a small left apracentral disk protrusion minimally affecting the left S1 nerve root . . . . Mild spinal stenosis L3-4 appearing since previous study . . . secondary to broad-based central disk protrusion. Mild central protrusion of the L4-5 disk unchanged.

*Id*. The noted purpose of Farmer's November 16, 2015 medical exam was for review of his record for an orthopedic referral. *Id*. It is noted that the referral was declined and that Farmer was referred for physical therapy (PT) which he had begun receiving on July 10, 2015.[7] *Id*. Farmer was complaining of chronic low back pain "with intermittent paresthesia[8] and left leg weakness" at that time. *Id*.

On December 28, 2015, Farmer was seen by Dr. Jason Clem and Dr. Getachew, via telemed regarding whether neurosurgery for his back was necessary. *Id*. at 15. During the examination "he was able to touch his toes with ease, bend laterally, and bend minimally to back, no pain." *Id*. It was further noted that Farmer reported "walking over a mile on [a] regular basis without issue." *Id.* Clem and Getachew attempted to explain to Farmer that, given his "good function he would not be [a] surgical candidate" but Farmer focused instead on the fact he was not receiving narcotic pain relief as he was prior to incarceration. *Id*. Upon Dr. Getachew's

---

[7] A record dated March 24, 2015, prepared by Dr. Paul Matera, indicates that Farmer had been receiving PT since November 26, 2014, and that Farmer reported that it had helped his back pain but still experiences "intermittent paresthesia" in his left lower leg. Farmer Med. R. 7.

[8] Parasthesia is an abnormal sensation such as burning, prickling, or crawling sensations. *See* https://medical-dictionary.com.

suggestion, Farmer's prescription for Ultram was increased and Farmer was assured that Ultram is an opiate. *Id.* Farmer was also referred to psychology and his "drug seeking behavior" was noted. *Id.*

On February 11, 2016, Farmer was seen for "continued chronic back and shoulder pain" and reported "that he had fallen out of the top bunk while he was trying to get out of bed" because "his leg 'gave out.'" *Id.* at 17. The fall occurred on January 18, 2016, and Farmer reported that since the fall he was unable to perform PT exercises; he had last received PT on January 22, 2016. *Id.* The medical director, who is not named in the record submitted, was consulted regarding further PT sessions and Farmer was instead "encouraged to work on exercises and stretching exercises as he is able to slowly regain flexibility and range of motion." *Id.* At that time, Farmer had received 12 PT sessions and a "formal consult" was "not placed at this time." *Id.*

On April 13, 2016, when Farmer was seen for pain management, the two MRI reports from 2008 and 2013 were still the only reports being relied upon for an assessment of Farmer's lumbar spine. *Id.* at 20. The same record notes that the plan of care[9] was to "[i]ncrease Tramadol from 50 mg BID to 100 mg BID" and there was improvement noted with that increase, but Farmer reported that he "still has significant low back pain that radiates down the left leg." *Id.* Despite the noted improvement, Farmer's Tramadol prescription was changed upon renewal to "50 mg BID on 4/1/16 without provider visit," causing Farmer's pain to increase. *Id.* It is noted that Farmer "[s]till wants to consider corrective surgery" but reportedly was considering

---

[9] The plan of care is noted as "12/28/16 – plan of care" but the documentation of the visit is dated April 13, 2016. Farmer Med. R. 20. The quality of the print on the copies provided to this Court is so poor it is not clear if the date is a typographical error or it actually reads "12/28/15."

delaying surgery until after his release so that "he can consult with surgeon of his own choosing." *Id*.

Farmer does not appear to have had further testing done to determine the source of his chronic back pain. A record dated February 10, 2017, reports that Farmer has suffered from lower back pain since 2003, from "lifting and hitting his back against the corner of a bench." *Id*. at 45. Farmer reported that the pain has gotten worse "with associated numbness in the [leg]" and that "he fell last week from his [leg] giving out." *Id*. It is noted that Farmer has no history of incontinence and does not use a cane, walker or wheelchair. *Id*. The physical exam that was provided during this visit revealed "no areas of swelling or redness" and Farmer's gait was described as normal. *Id*. Because his back pain was worsening, a consultation with an orthopedic doctor, Lawrence Manning, MD, was requested. *Id*. 46.

Farmer was seen by Dr. Manning on March 7, 2017, who noted that Farmer required "lumbar MRI scan asap." *Id*. at 48. Manning further noted that Farmer should return with the results of that scan. *Id*. The consultation for the recommended MRI was not generated until April 6, 2017, almost one month after Dr. Manning saw Farmer. *Id*. at 50–51. There is no indication in the records provided that Farmer was provided with an MRI of his lumbar spine, the results shown, or whether surgery is indicated by his condition.

*Shoulder injury*

Farmer injured his right shoulder after he slipped and fell while he was getting out of a correctional transport van while handcuffed in the front. The injury occurred in mid-February 2015, but Farmer did not seek immediate medical evaluation. An x-ray of his shoulder was performed on June 18, 2015. *Id*. at 10. The interpretation of the x-ray showed "no evidence of an acute fracture, dislocation or subluxation" and showed anatomical alignment. *Id*. Physical

examination of Farmer's right shoulder revealed tenderness and mild pain with motion. *Id*. at 11. Further, it was noted that "[a]bduction limited by 20 degrees with [complaints of] pain deep inside shoulder joint with radiation to biceps." *Id*.

On December 23, 2015, it was noted during Farmer's chronic care visit for pain management that he was currently receiving PT for his right shoulder. *Id*. at 12. The noted plan at that time was for Farmer to continue with PT and the "course for orthopedics for shoulder and back" would be discussed with a doctor. *Id*. at 14.

On April 13, 2016, during a chronic care visit, it was noted that Farmer had completed 8 sessions of PT between December 4, 2015 and January 22, 2016, but he reported no improvement of pain or range of motion. *Id*. at 20. The Physical Therapist noted that Farmer's range of motion had improved, but noted that the pain persisted and referred Farmer back to the provider for further management. *Id*. Farmer's shoulder injury was diagnosed as "rotator cuff syndrome not otherwise specified." *Id*. at 21.

On July 5, 2016, Farmer was seen by Dr. Lawrence Manning, an orthopedic surgeon, for his right shoulder. *Id*. at 30. Manning's treatment plan was noted as "MRI scan right shoulder to [evaluate] rotator cuff" and for Farmer to return after the MRI results are available. *Id*. Manning diagnosed the injury as a "rotator cuff injury." *Id*. at 31. On August 22, 2016, Dr. Wright noted the purpose of the MRI was to rule out a rotator cuff tear and that the MRI was recently ordered. *Id*. at 36.

On January 6, 2017, Dr. Onabajo noted during Farmer's chronic care visit that Farmer reported no relief of the pain in his shoulder despite prescriptions for Soma, Neurontin, Ultram, and Motrin. *Id*. at 42. The MRI of Farmer's shoulder was still pending; Onabajo renewed Farmer's medications and wrote orders for another consultation with Dr. Manning. *Id*.

When Farmer was seen again by Dr. Manning on March 7, 2017, he was seen for complaints regarding his lower back in addition to his right shoulder injury. *Id*. at 48. Farmer's right shoulder injury is mentioned, but the plan noted by Manning addressed scheduling an MRI for Farmer's lower back. *Id*.

In Dr. Wright's declaration under oath dated July 21, 2017, he states that Farmer has been scheduled for an MRI of his shoulder. Wright Aff. ¶ 17. There is nothing in the record before the Court indicating that Farmer ever received an MRI for either his lower back or his right shoulder as recommended by Dr. Manning.

### Pending Non-Dispositive Motions

*Motion to Amend Complaint*

Farmer seeks to amend his complaint to add claims against Bruce Ford, a Physician's Assistant who works at Eastern Correctional Institution where Farmer is currently confined. Mot. Am. Compl., ECF No. 26. The claim against Ford is that he tried to "kill" Farmer by forcing him to have contact with a blanket to determine if Farmer was allergic to it. *Id*. According to Farmer, he has a documented wool allergy and requested a different blanket than the one issued to him by the prison. He states that he could not use the wool blanket[10] because it would cause him to go into anaphylactic shock and he would stop breathing. Farmer claims when he reported this to medical staff, Ford forced him to lie underneath the blanket to determine if Farmer would have the reaction he claimed and told Farmer that if he stopped breathing he would use CPR to bring him back to life. *Id.* at 1–2.

---

[10]     *See* Farmer Med. R. 5 (January 19, 2015 encounter record with Ruth Pinkney, PA stating "According to management there is no wool in the blankets used at this facility.").

In addition to the claim regarding the blanket, Farmer alleges that Ford cut his Neurontin medication, changed his prescription from Ibuprofen to Tylenol, switched his Aprodine[11] medication to Zyrtec, failed to renew his prescription for shampoo, discontinued his muscle rub, and wrote prescriptions incorrectly causing a four day delay in receipt of medications. *Id.* at 2. Farmer asserts that Ford is doing these things out of retaliation for prior conflicts the two men had and adds that "these medications that Wexford use[s] are not ever used by actual pain management specialists." *Id*. at 3. Farmer opines that Ford is "not a qualified P.A." and that he "has way too much authority to undo what treatments 'actual' doctors have prescribed." *Id*. The Motion to Amend the Complaint was filed on August 23, 2017, approximately one-month after Defendants filed a Motion to Dismiss or for Summary Judgment.[12] Defendants oppose the motion on the basis that the proposed amendment is futile. ECF No. 28.

Pursuant to Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a matter of course within 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15 dictates that "[t]he court should freely give leave when justice so requires." *Id*. A Motion to Amend the Complaint must be reviewed for prejudice to the opposing party, bad faith, or futility of the amendment. *See Katyle v. Penn*

---

[11]    Aprodine is an antihistamine. *See* drugs.com. Farmer states that Aprodine, prescribed for his allergies, was working well when he was taking it. Mot. to Am. Compl. 2, ECF No. 26.

[12]    Farmer filed an earlier pleading entitled "Additional Claim Added with Evidence and Evidence Needed to Present" which was also filed after Defendants' dispositive motion. ECF No. 23. That pleading, which raises the same claims as the Motion to Amend Complaint, was also opposed by Defendants. ECF No. 24.

*Nat. Gaming, Inc.* 637 F.3d 462, 470–471 (4th Cir. 2011) (citing *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006)). "Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards: '[A] district court may deny leave if amending the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules.'" *Katyle*, 637 F.34 at 41 (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)).

Farmer's proposed amendment does not state an Eighth Amendment claim as to Ford and is therefore a futility. The only injury Farmer notes with regard to the claim concerning the blanket is a "minor rash." Mot. Am. Compl. 1. To the extent that Farmer experienced emotional distress as a result of the alleged actions, that distress cannot form the basis of a constitutional claim. Further, Farmer's disagreement with Ford's approach to confirming an allergy to the blanket in question does not state a constitutional claim. With regard to the changes in Farmer's medication, as well as the other gratuitous commentary[13] on Bruce Ford's competence generally, there is no constitutional guarantee that insures prisoners will receive medications of their choice without change or adjustment. *Williams v. Corizon Med. Serv.*, DKC-12-2121, 2013 WL 4541684, at * 7 (D. Md. Aug. 26, 2013) ("Disagreement with a medical provider does not amount to a violation of constitutional magnitude. An inmate's difference of opinion over matters of expert medical judgment or a course of medical treatment does not rise to the level of a constitutional violation."). Farmer cites no injuries befalling him as a result of the changes to his medications, some of which (*i.e.*, allergy medication) are not prescribed for treatment of a serious medical condition. The Motion to Amend Complaint is denied.

---

[13] Farmer's statements regarding Ford's competence and qualifications are inappropriate and could be considered evidence of bad faith; he is cautioned to limit his allegations to factual accounts without personal insults and name-calling when filing pleadings in this Court.

*Motion for Protective Order*

Defendants filed a Motion for Protective Order against Farmer's continued requests and demands for copies of his entire medical record, spanning over four and one-half years. ECF No. 37. In addition, Farmer filed a Request for Status of Subpoena for Medical Records (ECF No. 34), which Defendants address in their motion. In the latter pleading, Farmer claims he sent a demand to counsel for copies of his medical record which counsel denies receiving. ECF No. 37 at 1.

Farmer's requests for copies of his medical record are in the nature of discovery. While it is true that discovery has not yet commenced in this case because there has been no Rule 26(f) conference and a scheduling order has not been issued pursuant to Local Rule 803.2, Farmer may also seek discovery under Fed. R. of Civ. Proc. 56(d) and is not required to cite that rule specifically to invoke it. For reasons set forth more fully below, summary judgment will be denied in part and Farmer will be permitted to receive *relevant* copies of his medical record. The Motion for Protective Order is granted to the extent Defendants will not be required to provide the entire medical record, but denied to the extent Farmer seeks records not a part of the court's record that pertain to the need for surgery to his back and shoulder.

*Motion for "Temporary Injunction"*

In his Motion for Injunctive Relief, Farmer seeks an order requiring the release of his entire medical record; prohibiting Wexford employees from cutting and/or switching medications; and transferring him to another prison. ECF No. 38 at 1–3. Defendants oppose this motion. ECF No. 40.

A preliminary injunction is an "extraordinary and drastic remedy." *See Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). To obtain a preliminary injunction, a movant must demonstrate:

1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *See Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam). A preliminary injunction is distinguished from a temporary restraining order ("TRO") only by the difference in notice to the nonmoving party and by the duration of the injunction. *U.S. Dep't of Labor* v. *Wolf Run Mining Co.,* 452 F.3d 275, 281 n.1 (4th Cir. 2006) (comparing Fed. R. Civ. P. 65(a) with Fed. R. Civ. P. 65(b)).

Farmer's motion fails to establish that he is likely to succeed on the merits or to suffer irreparable harm absent the injunctive relief sought. *See Winter*, 555 U.S. at 20. The matter regarding his medical record has been addressed *supra* and does not require an injunction. The issue regarding Farmer's medication, which includes both pain and allergy medication, does not concern a matter that implicates Farmer's physical safety and is simply the product of his disagreement with medical care providers regarding appropriate medication. Farmer's request for a transfer to another prison concerns a decision over which none of the Defendants in this case have any control as they are all employees of the independent medical contractor. Moreover, a transfer to another Maryland correctional facility would not change the fact that Wexford Health Sources, Inc., the medical care contractor for all state correctional facilities, would be charged with providing Farmer with appropriate medical care. Because Farmer has not established these critical elements, I need not reach the other elements. *See Real Truth*, 575 F.3d at 347. Therefore, the motion is denied.

Plaintiff's motion indicates that he needs a thirty day extension to add plaintiffs to this action, all of whom are inmates confined to segregation. ECF No. 41. Federal Rule of Civil Procedure 23(a) delineates the prerequisites for a class action and provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

The complaint does not sufficiently allege claims that require a class action. To the extent numerous other individuals have claims regarding medical care at the prison, those claims require proof of a serious medical need individual to each litigant and proof that those needs were met with subjective, deliberate indifference. Claims regarding medical care are highly individualized and without evidence that there is a policy in place that requires blanket denial of medical care for a specific medical condition, a class action is not the appropriate approach. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361–62 (2011) ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.") (emphasis in original). Further, as Farmer is pro se, he is barred from instituting a class action whereby he would be representing others. *Myers v. Loudon County Public Schools*, 418 F.33d 395, 400 (4th Cir. 2005) (citing *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975)). Therefore, the motion

is denied; any other individuals who wish to pursue a claim may simply file a complaint with the Court.

## Standards of Review

### *Summary Judgment*

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "[b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247–48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644–45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).

*Eighth Amendment*

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments." *Grayson v. Peed*, 195 F.3d 692, 695–96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008), *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin

where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844.

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (holding that the focus should be on the precautions actually taken in light of the known risk, not those that could have been taken), *see also Jackson v. Lightsley*, 775 F.3d 170, 179 (4th Cir. 2014) (prescribing treatment raises fair inference that physician believed treatment was necessary and that failure to provide it would pose an excessive risk). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (refusing to evaluate transgender inmate for gender reassignment surgery where current therapy failed to alleviate urge for serious self-harm). The right to treatment is "limited to that

which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977).

## Analysis

Objectively, Farmer has an acknowledged chronic pain condition for which he has been referred to and seen by an orthopedist on at least three occasions. As a result of the examinations by Dr. Manning of Farmer's lumbar spine and right shoulder injury, MRI imaging was requested with a return to the doctor after the results are available. These facts are not in dispute. In his Opposition Response Farmer states that he was seen by Dr. Manning on September 12, 2017, at Regional Hospital. Pl.'s Opp'n 2, ECF No. 33. At that time he claims Dr. Manning told him that the condition of his lumbar spine had worsened and he recommended that Farmer be seen by a neurosurgeon after he receives a repeat MRI of his lower spine. *Id.* In addition, Farmer maintains that Manning stated he needs an MRI of his right shoulder which Farmer still has not received. *Id.*

Despite the known need for further information regarding the source of Farmer's chronic pain resulting from his right shoulder and lumbar spine conditions, there is no evidence that the MRI imaging of Farmer's lumbar spine and right shoulder has actually occurred, nor is there an explanation provided for the more than two year delay in doing so. To the extent that one or both issues are correctable through surgery, the delay in obtaining the imaging information required to make that decision may amount to a deliberate infliction of pain. The record establishes that Defendants Onabajo, Obsu, and Wright were well aware of these requests for MRI imaging and were all involved in the treatment for Farmer's chronic pain, but either permitted the delay to occur or refused to take corrective action. To the extent the delay is

attributable to a corporate policy or practice, the claim against Wexford Health Sources, Inc. also survives summary judgment. Summary judgment is denied without prejudice as to these Defendants on the claims concerning Farmer's need for lumbar spinal and right shoulder surgery.

But Farmer's claims regarding medication dosage changes as to all of the named Defendants, fail. Despite Farmer's assertions otherwise, it is clear from the verified medical records as well as Wright's declaration under oath that the Neurontin dosage was lowered because it was mistakenly written at a higher than therapeutic dosage. Moreover, it is clear that Farmer has not been denied all pain relieving medication; rather, he has been prescribed other medication (Ibuprofen, Tylenol, Ultram, and Soma) in addition to the Neurontin. With regard to Farmer's allergy medications, the underlying medical condition (allergic rhinitis) is not so serious that failure to treat it (which has not occurred here) would amount to an intentional infliction of pain. The Eighth Amendment does not guarantee that prisoners will receive the health care of their choice or the medications they prefer, but only that serious medical conditions will not be treated with deliberate indifference. The claims asserted regarding medications are dismissed as to all Defendants. *See Grayson*, 195 F.3d at 695; *Williams*, 2013 WL 4541684, at * 7 (citing *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010)).

Farmer's claim against Defendant Becky Barnhardt, RN, is based on one encounter on April 21, 2017, at MCTC, during which Barnhardt allegedly refused to adjust Farmer's pain medication, provide him with a different blanket, write an order for a diet because Farmer had lost weight, and provide him with a double mattress to accommodate Farmer's injured shoulder. ECF No. 12-1 at 1–2. The encounter slip with Barnhardt indicates that Farmer was told that MCTC did not issue double mattresses or cotton blankets and that there was no diet wherein an additional snack bag would be provided. Farmer Med. R. 53. Barnhardt further noted that

Farmer's body mass index (BMI) was "over 21 percent," but because Farmer continued to insist that he wanted to be placed on a diet, paperwork was filled out and submitted for approval. *Id.* With regard to his medication, Barnhardt relates that she informed Farmer that his medication was reviewed and kept the same at MCTC as it had been at DRCF and that any medication (muscle rub and bacitracin) not provided at his last chronic care clinic was not indicated by the medical care provider. *Id.* Farmer apparently left and told Barnhardt he would add her name to his lawsuit. *Id.*

Similarly, Farmer's claim against Dr. Jonathan Thompson is based on little more than an unpleasant single encounter during which Farmer was provided information he did not want to hear. *Id.* at 50. Farmer complained to Thompson that he was only receiving his Tramadol and Neurontin twice per day at MCTC when he was receiving it three times per day at DRCF. Farmer informed Thompson he wanted his medication delivered three times per day instead. Although Thompson prescribed 1200 mg of Neurontin twice per day and 100 mg of Tramadol per day, Farmer demanded 200 mg of Tramadol per day and threatened to sue Thompson when he did not provide Farmer with what he demanded. *Id.*

Farmer's claims as to Barnhardt and Thompson amount to a disagreement over the delivery of medical care. Refusal to administer medication in three doses or at the levels demanded by a prisoner does not shock the conscience nor does it exhibit a callous disregard for Farmer's life. There is nothing to suggest that Barnhardt and Thompson's failure to honor Farmer's demands resulted in the unnecessary infliction of pain or endangered his life. Barnhardt and Thompson are entitled to summary judgment in their favor as to the claims against them and those claims are dismissed.

The following chart shows the claims that remain and the claims that have been dismissed:

| Remaining claims | Dismissed claims |
|---|---|
| Eighth Amendment<br>• Claims Drs. Onabajo, Obsu, and Wright regarding failure to provide prescribed testing to determine cause of chronic back and shoulder pain<br>• Claim against Wexford Health Sources, Inc. regarding failure to approve or make arrangements for  full treatment and diagnosis of chronic back and shoulder pain | Eighth Amendment<br>• All claims concerning changes in medication.<br>• All claims against Rebecca Barnhardt, RN and Jonathan Thompson, MD |

A separate Order, granting in part and denying in part Defendants' Motions to Dismiss or for Summary Judgment (ECF No. 21) and for Protective Order (ECF No. 37), and denying Farmer's Motions to Amend his Complaint (ECF No. 26), for Injunctive Relief (ECF No. 38), and for an Extension of Time to File a Class Action (ECF No. 41) follows.

As this case is proceeding and entering discovery, the circumstances have changed sufficiently to warrant the appointment of pro bono counsel as Farmer has previously requested. *See* ECF Nos. 6, 18.  Also, I note that in order to insure that the surviving claims proceed expeditiously without the constant filing of motions by Farmer or Defendants without advance screening to determine whether they are colorably meritorious, I am initiating a pre-motion conference procedure.  Under this procedure, no motion whether substantive or procedural (including discovery related motions) may be filed until it is reviewed by me in advance.  A request to file a motion shall be initiated by filing a letter, not to exceed three pages, single spaced.  A separate order shall issue providing counsel more guidance on this procedure.  The parties are advised that filing motions in disregard of this order will result in their being stricken from the docket.

Lastly, Defendants shall file their answers on or before January 5, 2018. At that time, I will enter a Scheduling Order in this matter, and once Plaintiff's counsel is appointed, I will hold a Fed. R. Civ. Proc. 16 conference via telephone with counsel to discuss this litigation moving forward.

Date: December 13, 2017 _____/S/_____
Paul W. Grimm
United States District Judge

jml