IN THE UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |
|---|---|
| **JEFFREY FARMER** | \* |
| Plaintiff | \* |
| v. | Case No.: 8:17-cv-0346-PWG |
| **WEXFORD HEALTH SOURCES, INC.,** *et al.* | \* |
| Defendants | \* |

## MEMORANDUM OPINION

Jeffrey Farmer is a former inmate who was incarcerated in the Maryland Department of Corrections from April 2013 until April 1, 2019. Defs.' Mot. Mem. 1, ECF No. 86-1. He commenced this 42 U.S.C. § 1983 action *pro se*[1] against prison medical personnel, alleging deliberate indifference by Muleta Obsu, M.D.; Mofikpara Wright, M.D.; and Bolaji Onabajo, M.D. ("Doctors") in treating his chronic lower back pain and a shoulder injury he suffered while incarcerated. Compl. 3, ECF No. 1; Pl.'s Resp. 1, ECF No. 38. He also raises a *Monell* claim against Wexford Health Sources, Inc. ("Wexford"), the Doctors' employer and the entity formerly hired by the State of Maryland to provide certain health services to inmates. *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978); Defs.' Mot. Mem. 1.

---

[1] Subsequently, the Court appointed counsel to represent Plaintiff, and they agreed to take the case *pro bono*. The Court expresses its thanks for doing so.

1

Now, the Doctors and Wexford have filed a motion for summary judgment, contending that Mr. Farmer has not produced any admissible facts to establish deliberate indifference by the Doctors or, regarding the *Monell* claim, concerning Wexford's policies or customs.  Instead, the Doctors submit, Mr. Farmer's medical needs were addressed appropriately.  Defs.' Mot. Mem. 3. Furthermore, on the *Monell* claim, Wexford argues there are not facts to show a constitutional violation against Mr. Farmer.

Farmer also raised claims against other medical personnel, alleging he received inadequate pain and allergy medication.  I dismissed those claims after finding Defendants were entitled to summary judgment. Order, ECF No. 43.  Having so ruled, the remaining issues, now decided here, are first whether the Doctors were deliberately indifferent by failing "to provide prescribed testing to determine [the] cause of [Farmer's] chronic back and shoulder pain," and second whether Wexford was deliberately indifferent by "fail[ing] to approve or make arrangements for full treatment and diagnosis of chronic back and shoulder pain."  Mem. Op. 25, ECF No. 43.

The arguments have been fully briefed. *See* ECF Nos. 86, 89, 90.  A hearing is not necessary.  *See* Loc. R. 105.6 (D. Md. 2018).  For the reasons that follow, I will grant the motion for summary judgment and dismiss the case with prejudice.

**Factual Background**

*Back Pain*

It is undisputed that Farmer suffers from longstanding lower back pain, which originated prior to his incarceration, and sustained a shoulder injury while incarcerated.  Compl. 3–4; Defs.' Mot. Mem. 2.  Records pre-dating Mr. Farmer's incarceration, specifically a 2008 MRI, show a massive herniated disc in his spine at L5-S1. On December 31, 2008, Mr. Farmer consulted with

2

Dr. Spiro Antoniades who reviewed the MRI results and suggested courses of treatment, including: medical pain management, epidural steroid injections, or surgery.  Defs.' Mot. Mem. 2.

Farmer's lower back pain persisted during his incarceration, despite some improvement occurring prior to a November 10, 2010 MRI.  Ex. 3 to Defs.' Mot. Mem. 139[2] (ECF No 86-4). Farmer had a series of visits with prison medical providers during his incarceration.  Notable visits include a November 15, 2014 visit with Dr. Matera where Dr. Matera informed Farmer that an orthopedic evaluation of Farmer's back problems would be deferred because surgery was unlikely to resolve Farmer's chronic pain.  *Id*. at 43.  Farmer also indicated he would decline surgery if it were available.  *Id*.  Farmer made a similar indication during a December 28, 2015 appointment with Dr. Clem and Utilization Management Director Asresahegn Getachew.  During that appointment, he underwent a physical exam where he touched his toes easily and reported walking over a mile without issues.  He was advised that he would not be a surgical candidate due to his functionality.  *Id.* at 64.

Farmer first saw Dr. Wright on July 15, 2016 for complaints of back pain after Farmer was transferred to Dorsey Run Correctional Facility in Jessup.  *Id*. at 128–29.  Dr. Wright conducted a physical exam and renewed Famer's Neurontin prescription at a lower dose, continued his other prescriptions, and advised use of a warm compress.  *Id*.  Additionally, Dr. Wright ordered a new x-ray of Farmer's lumbosacral spine.

Farmer's last visit with Dr. Wright occurred on November 9, 2016.  Dr. Wright conducted a physical examination of Farmer's back and shoulder and continued his pain medications.  *Id.* at

---

[2]  The court is using the pagination assigned through CM/ECF as opposed to the various pre-existing forms of pagination in the medical records.

140–41.  At his deposition, Dr. Wright testified that Farmer's chronic condition stemming from an old injury did not necessitate an urgent MRI.  Ex. 4 to Defs.' Mot. 101:16-102:1; 102:20-103:2.

On July 5, 2017, Farmer underwent an MRI on his lumbar spine that showed: (1) degenerative disc disease from L3-4 through L5-S1; (2) a broad-based posterolateral disc herniation at L5-S1 causing posterior displacement of the left S1 nerve root and impinging upon the proximal portion of the left L5 nerve root canal; (3) a central extruded disc herniation at L4-5 that mildly encroached upon the central spinal canal with minimal bilateral L4 foraminal stenosis; and (4), a bulging disc at L3-4 with partial annular tear, minimal central canal stenosis, and minimal bilateral foraminal stenosis.  Ex. 3 to Defs.' Mot. Mem. 135.

On September 12, 2017, Farmer saw Dr. Manning, an orthopedic surgeon, regarding his lower back.  *Id.* 131–32.  Dr. Manning recommended a neurosurgery consultation and, after some intervening appointments, Farmer had a neurosurgery consultation with Dr. Pierre.  *Id.* 143–48.  Based on Farmer's presentation, Dr. Pierre advised against back surgery but did recommend Farmer continue his pain management medication and undergo an epidural injection.  *Id.* at 146.  Dr. Pierre also recommended an EMG nerve conduction study.  *Id*.  On June 1, 2018, Farmer received the epidural and reported that it relieved his pain for only one day.  *Id.* at 149.  Dr. Pierre reviewed the EMG study with Farmer on July 6, 2018; Dr. Pierre believed Farmer was suffering radiculopathy from the L5-S1 level and recommended continuation of conservative care.  *Id.* at 150.  Dr. Pierre also requested that Farmer's Neurontin prescription be resumed "to see if this alleviates his symptoms."  *Id*.  Farmer received another MRI of his lower back on November 2, 2018, which showed a spine condition essentially unchanged from the November 2010 MRI.  *Id*. at 157.

On November 5, 2019, after being released, Farmer again consulted Dr. Antoniades, who suggested surgery would not be beneficial. Ex. 7 to Defs.' Mot. Mem.

*Shoulder Pain*

Farmer injured his right shoulder after he slipped and fell while exiting a correctional transport van while handcuffed. The injury occurred in mid-February 2015, but Farmer did not seek immediate medical evaluation. Prison medical providers x-rayed his shoulder on June 18, 2015. Ex. 3 to Defs.' Mot. Mem. 59. The interpretation of the x-ray showed "no evidence of an acute fracture, dislocation or subluxation" and showed anatomical alignment. *Id*. A physical examination of Farmer's right shoulder revealed tenderness and mild pain with motion. *Id*. at 60. Further, it was noted that "[a]bduction limited by 20 degrees with [complaints of] pain deep inside shoulder joint with radiation to biceps." *Id*.

Medical records from December 23, 2015, disclose that Farmer was receiving ongoing physical therapy for his right shoulder. *Id.* at 61. The noted plan at that time was for Farmer to continue with physical therapy and the "course for orthopedics for shoulder and back" would be discussed with a doctor. *Id*. at 63.

On April 13, 2016, records from a chronic care visit noted that Farmer had completed eight sessions of physical therapy between December 4, 2015 and January 22, 2016, but he reported no improvement of pain or range of motion. *Id*. at 72. The Physical Therapist noted Farmer's range of motion had improved but that the pain persisted, and referred Farmer back to the provider for further management. *Id*. Farmer's shoulder injury was diagnosed as "rotator cuff syndrome not otherwise specified." *Id*. at 73.

On July 5, 2016, Dr. Manning saw Farmer for his right shoulder. Ex. 1 to Defs.' Mot. Mem. 30, ECF No. 21-4. Manning's treatment plan was noted as "MRI scan right shoulder to

5

[evaluate] rotator cuff" and for Farmer to return after the MRI results were available. *Id*. Dr. Manning diagnosed the injury as a "rotator cuff injury." *Id*. at 31. On August 22, 2016, Dr. Wright noted the purpose of the MRI was to rule out a rotator cuff tear and that the MRI was recently ordered. Ex. 3 to Defs.' Mot. Mem. 86. Dr. Wright also observed tenderness in the shoulder and a reduced range of motion. *Id*.

On January 6, 2017, Dr. Onabajo noted during Farmer's chronic care visit that Farmer reported no relief of the pain in his shoulder despite prescriptions for Soma, Neurontin, Ultram, and Motrin. *Id*. at 95. The MRI of Farmer's shoulder was still pending; Dr. Onabajo renewed Farmer's medications and wrote orders for another consultation with Dr. Manning. *Id*. at 96.

On February 10, 2017, Farmer had his last visit with Dr. Onabajo. Farmer stated that his pain was worse; Dr. Onabajo again requested a consultation with Dr. Manning and continued Farmer's pain management prescriptions. *Id*. 98–99.

On December 26, 2017, Farmer received an MRI of his shoulder, which showed "minimal tendinopathy changes in the supraspinatus tendon near the humeral head" and a "[p]ossible SLAP lesion involving the superior labrum." *Id.* at 119.

On March 6, 2018, Farmer had a telemedicine visit with Dr. Ashok Krishnaswamy, who proposed outpatient surgery on Farmer's rotator cuff to repair the possible SLAP; Farmer agreed to the plan. *Id*.

On April 23, 2018, Farmer arrived at Bon Secours Hospital, where he was scheduled to undergo his shoulder operation. However, while waiting for his surgery, he changed his mind and elected not to go through with the procedure. According to Farmer, his inability to look up the surgeon led him to decide against the surgery. *Id.* at 122. It is undisputed that Farmer never sought treatment for his shoulder after declining to go through with the operation at Bon Secours.

Defs.' Mot. Mem. 16.

Farmer filed this lawsuit against the aforementioned doctors and their employer, asserting they exhibited deliberate indifference to his substantial medical needs. While Mr. Farmer originally filed his suit *pro se*, John Yannone of Price Benowitz, LLP entered an appearance on Mr. Farmer's behalf on January 25, 2018 and represents him *pro bono*. The Defendants have moved this Court to grant them summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure. Mr. Farmer opposes the motion.

**Standard of Review**

*Summary Judgment*

Federal Rule of Civil Procedure 56(a) provides for the judgment in favor of the movant "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Only factual disputes that "might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Additionally, the factual dispute must be genuine to defeat a motion for summary judgment in that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version."). The existence of only "a scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 251–52.

Either party may assert that a fact is genuinely disputed, or cannot be genuinely disputed, by submitting certain materials to the Court such as documents, declarations, and affidavits. Fed. R. Civ. P. 56(c). It is the nonmoving party's burden to confront a motion for summary judgment with affirmative evidence to show that a genuine dispute of material fact exists. *Anderson*, 477

U.S. at 256. A plaintiff nonmovant, "to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor." *Id.* When ruling on a motion for summary judgment, the court may not make credibility determinations regarding conflicting testimony or declarations. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

*Eighth Amendment*

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard— a showing of mere negligence will not meet it . . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . . To lower this threshold would thrust federal courts into the daily practices of local police departments." *Grayson v. Peed*, 195 F.3d 692, 695–96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the

medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008), *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. The plaintiff must establish "that prison officials acted with a 'sufficiently culpable state of mind.'" *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 834); *see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) ("a prisoner must show . . . that officials knowingly disregarded [a serious medical] need and the substantial risk it posed"). "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844.

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe*

*v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (holding that the focus should be on the precautions actually taken in light of the known risk, not those that could have been taken); *see also Jackson v. Lightsley*, 775 F.3d 170, 179 (4th Cir. 2014) (prescribing treatment raises fair inference that physician believed treatment was necessary and that failure to provide it would pose an excessive risk). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (refusing to evaluate transgender inmate for gender reassignment surgery where current therapy failed to alleviate urge for serious self-harm). The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977). Additionally, "mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." *Scinto*, 841 F.3d at 225 (quoting *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)).

*Monell*

A *Monell* claim is a form of § 1983 action under which a municipality or qualifying state actor, or an entity *acting* under the authority of a municipality or qualifying state actor, such as Wexford, is liable "where a policymaker officially promulgates or sanctions an unconstitutional law, or where the municipality is deliberately indifferent to the development of an unconstitutional custom." *Smith v. Ray*, 409 F. App'x 641, 651 (4th Cir. 2011); *see Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978). A municipality is only liable under *Monell* if, pursuant to a municipal policy or custom, a municipal employee took unconstitutional action.

*Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984); *Walker v. Prince George's Cty., Md.*, 575 F.3d 426, 431 (4th Cir. 2009); *Peterson v. Prince George's Cty.*, No. PWG-16-1947, 2018 WL 488827, at *6 (D. Md. Jan. 19, 2018).  While Wexford is not a municipality, it is still susceptible to a *Monell* claim.  The Supreme Court has held that to be state action, "the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible . . . [and] the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson*, 457 U.S. 922, 937 (1982).  This standard also applies to private companies that employ individuals acting under color of state law, such as special police officers who allegedly commit unlawful acts.  *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999).  The same standard applies to doctors contracted to provide state inmates with health services.[3]

### Discussion

I must first decide whether there are genuine issues regarding whether the three Defendant Doctors were deliberately indifferent in failing "to provide prescribed testing to determine [the] cause of [Farmer's] chronic back and shoulder pain," and second, whether there are genuine issues regarding whether Wexford was deliberately indifferent by "fail[ing] to approve or make arrangements for full treatment and diagnosis of chronic back and shoulder pain." Mem. Op. 1, ECF No. 43.

At this stage, the inquiry is "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251–52.  My task, according to the Supreme Court, is to assess whether

---

[3]   Wexford does not dispute that it is susceptible to a *Monell* claim.  Defs.' Mot. 24.

there is evidence of a quantity and quality sufficient to allow "reasonable jurors [to] find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson*, 477 U.S. at 252. Having made all reasonable inferences in favor of the nonmovant and having not made any credibility determinations, I find all Defendants are entitled to summary judgment. *Anderson*, 477 U.S. at 255.

In their motion, the Doctors argue Farmer has not met his burden to support his obligation to come forward with facts sufficient to create a material dispute on the elements of a claim for deliberate indifference. Those elements are: (1) "that objectively assessed, he has a sufficiently serious medical need to require treatment," *Brice v. Virginia Beach Correctional Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995); and (2) that the individual defendants "had actual knowledge of [his] serious medical needs and the related risks, but nevertheless disregarded them," *DePaola*, 844 F.3d at 486. Defendants also state that Farmer must produce evidence sufficient to raise a genuine factual dispute about whether he was injured by the Defendants' deliberate indifference. Defs.' Mot. Mem. 20; *see* 42 U.S.C. § 1983.

Farmer argues that the focal issue for the Court on the current motion for summary judgment "is whether the Defendant Doctors were deliberately indifferent to Plaintiff's lower back pain and failed to adequately treat it in some meaningful way." Pl.'s Resp. 5. Specifically, Farmer states that "there were other treatment avenues that could and should have been explored properly but weren't." *Id*. The Doctors' failing, Farmer states, was that they all "had actual subjective knowledge of both Plaintiff's well-documented chronic lower back pain, and of the 2008 and 2010 lumbar MRI findings," but did not order a follow-up lumbar MRI or provide "appropriate conservative pain management treatment" to adequately alleviate Farmer's pain. *Id.* at 6. Instead, the Doctors "never considered other modalities of treatment," but chose to maintain "a bare-bones

pain management regimen" and "remain[] blissfully ignorant of any underlying pathology by virtue of the delay in performing objective diagnostic testing." *Id.* This situation, Farmer asserts, creates a genuine dispute as to material fact regarding whether the Defendant Doctors were deliberately indifferent to Plaintiff's serious medical need for lower back treatment. *Id.*

Farmer raises similar arguments regarding his shoulder injury, stating that Dr. Wright declined to increase the priority for a previously-ordered MRI on Farmer's shoulder. Pl.'s Resp. 7. During an October 2016 visit, Dr. Obsu similarly declined to re-order or otherwise increase the priority of the right shoulder MRI. *Id.*; Ex. 3 to Defs.' Mot. Mem. 90–91. On December 26, 2017, after additional visits with Dr. Wright on November 9, 2016 and Dr. Onabanjo on January 6, 2017, Farmer received an MRI on his right shoulder. Ex. 3 to Defs.' Mot. Mem. 119. The MRI showed "a possible SLAP lesion involving the superior aspect of the glenoid process/labrum," an injury that led Dr. Krishnaswamy to propose surgery. *Id*.

Farmer states the shoulder MRI demonstrates an objectively severe medical condition requiring treatment. But Farmer then downplays his refusal to undergo surgery because "it was entirely possible to treat Plaintiff's condition through alternative pain management systems which would adequately address his pain." Pl's Resp. 8. Farmer states that this gives rise to a viable deliberate indifference claim because the doctors "had actual subjective knowledge" of Farmer's shoulder condition yet "chose not to prescribe appropriate pain management medication." Pl.'s Resp. 8. Also in dispute here, according to Farmer, is whether the delay in obtaining the shoulder MRI is attributable to the doctors, as opposed to Defendants' argument that it cannot be attributed to them. Pl.'s Resp. 9; Defs.' Mot. Mem. 24. In an effort to substantiate the dispute, Farmer points to Dr. Thompson's seeming ability to expedite Farmer's lower back MRI after Farmer threatened Dr. Thompson with a lawsuit. Pl.'s Resp. 9.

In reply, the Defendants argue Farmer's opposition fails to specify—much less provide evidence of—a different course of treatment that the Doctors should have pursued. Defs.' Reply 6 (ECF No. 90). To survive the motion, Defendants argue, Farmer has "the burden of producing admissible evidence to show what those treatment options were, that they were appropriate, and that he has a medical need for those options." *Id.* Additionally, they state, "Farmer does not make that showing, nor does he even attempt to do so." *Id.* Regarding the delay in receiving an MRI, Defendants point to the fact that Farmer had an MRI ordered and was awaiting scheduling. *Id*. And Defendants state "[t]he admissible evidence in the record is that, in their roles as physicians, once the MRI had been approved, there was nothing more for the individual Defendants to do to obtain a shoulder MRI for Farmer." *Id.*

As to the claim against Wexford, the Reply argues Farmer failed to produce evidence to suggest "the existence of any Wexford practice or custom that could have caused any person to violate any of his federal protected rights." *Id.* at 7.

Under the framework for a deliberate indifference claim, discussed *ante*, Farmer must show that he had an objectively serious medical condition, that the medical providers were subjectively reckless in responding to his serious medical condition, and that he suffered an injury as a result of their conduct.

It is undisputed that Farmer received pain medication and physical therapy for his conditions. It is also undisputed that, regarding his lower back, surgery was not an appropriate treatment during his incarceration and that Farmer would not go through with back surgery if offered the chance to have it. What Farmer argues is that the Doctors should have explored other courses of treatment. But Farmer fails to articulate to what those treatments might be, much less produce evidence as to alternative courses of treatment. While it is clear from the medical records

14

that the Doctors had objective knowledge of Farmer's back problems, it is also clear from the records that the Doctors endeavored to treat Farmer with the range of treatments available. Farmer tries to convince the Court that the doctors should have ordered an additional MRI of Farmer's back, but the evidence in the record is clear that the Doctors knew what Farmer was suffering from; they endeavored to treat him; and additional MRIs on Farmer's lumbar spine would not have made a difference—Farmer had such an MRI and the findings hardly differed from his MRIs predating incarceration. Further, Farmer received additional treatment and testing for his back pain in the form of an epidural and an EMG test. The results of the EMG test affirmed Dr. Pierre's conservative care plan. This is not a bare-bones treatment regimen and there is no evidence of subjective recklessness as to Farmer's ailments.

Regarding the delay in obtaining an MRI on Farmer's shoulder, there is no evidence in the record to suggest the delay here creates a viable claim of deliberate indifference. Again, Farmer was receiving physical therapy and pain medication while awaiting the MRI. Once the MRI finally occurred and he was referred to surgery, Farmer got cold feet at the last minute. And finally, it is undisputed that tests such as MRIs are allocated in the State of Maryland's prison system based on the urgency of the need. Farmer does not refute Dr. Wright's testimony that Farmer did not present with an urgent need for an MRI of his shoulder. Ex. 4 to Defs.' Mot. Mem. 101:16-103:2.

As to the *Monell* claim against Wexford, I find that there is no evidence in the record upon which to base a claim that Wexford promulgated a policy of unconstitutional conduct, or evidence that Wexford was deliberately indifferent to development of an unconstitutional custom. Referencing his arguments about the Doctors' allegedly unconstitutional conduct, Farmer states "[a]s a result of the foregoing, there exist genuine disputes as to material fact concerning the extent to which Plaintiff's constitutional rights were violated." Pl.'s Resp. 10. But Farmer cites no facts

in the record to substantiate this argument, and my review of the record reveals no such evidence. Nor is there evidence that Wexford failed to approve of make arrangements for full treatment and diagnosis of Farmer's medical conditions.  And most importantly to the *Monell* claim, I find there is no genuine dispute regarding whether the Doctors engaged in unconstitutional conduct while treating Farmer over the course of his incarceration.  Accordingly, I grant the Defendants' motion for summary judgment on the *Monell* claim.

## Conclusion

For the reasons stated, the Defendants' motion for summary judgment is granted with prejudice.  A separate order follows.

DATED this 30th day of October, 2020.

BY THE COURT:

/S/
Paul W. Grimm
United States District Judge